[Cite as *State v. Mangie*, 2011-Ohio-1005.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                      )
                                    )   CASE NO.    10 MA 88
    PLAINTIFF-APPELLEE,          )
                                    )
VS.                                 )   O P I N I O N
                                    )
RONALD MANGIE,                      )
                                    )
    DEFENDANT-APPELLANT.         )


CHARACTER OF PROCEEDINGS:        Criminal Appeal from County Court No.
                                 2, Case No. 08CRB594.


JUDGMENT:                        Affirmed.


APPEARANCES:
For Plaintiff-Appellee:          Attorney Paul Gains
                                 Prosecuting Attorney
                                 Attorney Ralph Rivera
                                 Assistant Prosecuting Attorney
                                 21 West Boardman Street, 6th Floor
                                 Youngstown, Ohio  44503

For Defendant-Appellant:         Attorney David Betras
                                 6630 Seville Drive
                                 Canfield, Ohio  44406


JUDGES:
Hon. Joseph J. Vukovich
Hon. Gene Donofrio
Hon. Cheryl L. Waite

Dated: February 25, 2011

VUKOVICH, J.

¶{1} Defendant-appellant Ronald Mangie appeals the decision of Mahoning County Court No. 2 which found him guilty of practicing dentistry without a current license. Appellant raises issues concerning the weight and sufficiency of the evidence. However, there is competent, credible evidence that appellant engaged in the practice of dentistry as he made a diagnosis and formulated a treatment plan after examining her permanent crowns and introducing himself to a dental patient as "Dr.". As such, the judgment of the trial court is affirmed.

<u>STATEMENT OF THE CASE</u>

¶{2} Dr. James Gentile had a patient in his dental practice who needed teeth removed. A different dentist in the office, Dr. Kilgore, performed the surgery. He later inserted three implants and then had crowns made, which he screwed into the implants in September of 2007. The patient had complaints regarding the fit, and she returned to have the screws tightened various times. Dr. Kilgore then terminated his affiliation with Dr. Gentile's office. When the patient called again to complain about the fit of her crowns, she spoke to a Dr. Mangie. As it turned out, Dr. Mangie was an unlicensed dentist who was hoping to get his license back. (12/16/08 Tr. 53).

¶{3} Dr. Mangie told the patient that they would correct the problem. (12/16/08 Tr. 112-113). However, each time she arrived at the office, her appointment would be canceled. (12/16/08 Tr. 114). Thus, she contacted the Better Business Bureau and the Ohio State Dental Board. The Dental Board began a covert investigation in conjunction with the Boardman Police Department. Out of concern with the complaint filed with the Better Business Bureau, Dr. Gentile's office finally saw the patient. An undercover Boardman police officer waited in the waiting room for her while she attended the appointment wearing audio and video recorders.

¶{4} Jeff Melia was the first employee to enter the operation room. He had graduated from certified dental assistant school but had not yet been registered as a certified dental assistant. Mr. Melia removed at least one of the patient's crowns and informed her that Dr. Gentile and Dr. Mangie were on their way. (Tr. of Recording 4,

6).  Dr. Gentile briefly entered the room and looked at her chart and teeth.  He stated that he noticed that the crowns made a "food trap" and advised her to wait until the business manager comes in so they could take steps to correct the problem.  (Tr. of Recording 7).

¶{5}   After Dr. Gentile left, Mr. Melia stated that he was waiting for Dr. Mangie so he could put her tooth back in.  (Tr. of Recording 10).  Mr. Melia then related that "the doctor" said that the upper tooth is too low so he wants to trim it; he then stated that "he" is coming in at which point Dr. Mangie entered the room.  (Tr. of Recording 12).  Dr. Mangie stated in pertinent part:

¶{6}   "[APPELLANT]:  Dr. Mangie.

¶{7}   "[PATIENT]: Hi.

¶{8}   "[APPELLANT]:  I remember you.  Let's see how you're doing.  I see some of the problems that's going on.  Jeff showed me the models.  It's not going to be that big of a problem to correct.  Like this one down here.  (Inaudible) look beautiful.  Okay.  Close down here.  Yeah, just give her - - let me show you the model.  * * *  (Tr. 12-13).

¶{9}   "What we have to do, Jeff, is - - that's an (inaudible) in there.  So what we'd have to do is reduce the - - see what happened, you lost your lower tooth.  You see how that one is longer than these?

¶{10} "[PATIENT]:  Yeah.

¶{11} "[APPELLANT]:  We've got to reduce that a little bit.

¶{12} "[PATIENT]:  All right.

¶{13} "[APPELLANT]:  That's no big deal.  We do that all --

¶{14} "[PATIENT]:  What about when you make the new, the new crown?

¶{15} "[APPELLANT]:  That will make it look better.  (Tr. 13).

¶{16} "[PATIENT]:  Oh, this will be replaced, right, the one that --

¶{17} "[APPELLANT]:  Yeah, we'll make it look more like a tooth.  * * *  You know, you can only do so much with those.  But I know we can help this out.

¶{18} "[PATIENT]:  I mean, food kept getting stuck underneath there.  It's just so small.

¶{19} "[APPELLANT]:  See that?  See how long that is?  * * *  I'm going to draw the lines where we get, get that reduced.  And this one here, same way, we can make these look more -- like they're just coming to -- they're trying to help protect them.  But if they're in there nice and tight, there's no reason why we can't give her more of an anatomical look.

¶{20} "[MR. MELIA]:  Right.

¶{21} "[APPELLANT]:  So they look more like teeth.  See, close a little bit.  Retract that, Jeff, I don't have gloves on.  Turn your head towards me, honey.  Close a little bit now.  Yeah.  Yeah, all they have to do is bring that (inaudible) like we always do (inaudible). * * * (Tr. 14-15).  Let me draw that now so we can see where that comes off.  Do you have a pencil?  You need to put her crown back in.  Yeah, I know what you need done.  (Tr. 15).  * * *

¶{22} "Because that tooth drifted.  It seems like a dangling wheel on that.  Definitely take this down.  This is going to give us the whole thing.  And that has to be polished carefully and with co[a]rse pumice, (inaudible) and that.  And then we'll reseal the tooth so it's real smooth.  Yeah, if we take that off - - see what we're talking about here?

¶{23} "[PATIENT]:  Uh-huh.

¶{24} "[APPELLANT]:  Then that gives us  a whole bunch of room.  Then we'll be able to bring this over this, the way it is now.

¶{25} "[PATIENT]:  To cover that up?

¶{26} "[APPELLANT]:  Yeah.  Yeah.  For some reason or other the (inaduble) only do so much; they don't think of the real [a]esthetics.  They think only the function, the function, the function.  We've got to make it work; we've got to make it work.

¶{27} "[PATIENT]:  Yeah, got to make it look good.

¶{28} "[APPELLANT]:  Yeah, you're going through all that trouble, make it look good.  And that's always been my forte, making it all look perfect.  So yeah, we'll be able to fix those up."  (Tr. of Recording 16-17).

¶{29} Appellant then said he would come in for the next appointment and reassured her that Mr. Melia was skilled and that he "stuck by me for years."  (Tr. of

Recording 17). Mr. Melia then replaced the patient's crown (so that she would not have to go to a wedding that night with missing teeth).

¶{30} As a result of these occurrences, Dr. Gentile was charged with permitting the unlawful practice of dentistry. Mr. Melia and appellant were charged with the unlawful practice of dentistry, a first-degree misdemeanor in violation of R.C. 4715.09(A). The case was tried to the bench.

¶{31} The patient testified as to the events leading up to the charges. The Executive Director of the Dental Board testified regarding the Ohio Administrative Code and related that if a task is not listed under the dental assistant's duties, then the task cannot be performed by anyone but the dentist. (12/16/08 Tr. 257-258). Because the code says that an assistant can cement and remove provisional appliances, the Director concluded that an assistant cannot remove permanent appliances or screw into implants. (12/16/08 Tr. 259, 270). A Dental Board investigator opined that the permanent crowns in the patient's mouth did not become temporary merely because they decided to order another set of permanent crowns. In support, he noted that the patient had already been billed for permanent crowns. (12/16/08 Tr. 74).

¶{32} A Dental Board employee, who is also a certified dental assistant, testified that legally she is not permitted to attach a permanent crown with a screw or cement, remove a permanent crown, remove the bonding covering a screw, or scale a tooth. (12/16/08 Tr. 166-167, 170). She noted that she never witnessed a dentist use a screw like this for a temporary crown and testified that the crown here was permanent because it was porcelain fused to metal. (12/16/08 Tr. 177, 186). She concurred that a crown does not become temporary merely because a new one needs to be made or because a dentist forgets to fill a screw hole with composite. (12/16/08 Tr. 182, 197).

¶{33} A dentist testified for the state that a crown made of porcelain fused to metal is a permanent crown. (12/16/08 Tr. 210). He stated that a permanent crown does not become temporary due to a changed intent after the patient has problems; rather, the situation is merely the replacement of one set of permanent crowns with another set of permanent crowns. (12/16/09 Tr. 225-226, 230-231, 238). He opined

that appellant engaged in the practice of dentistry because he examined, diagnosed, and ordered treatment for the patient. (12/16/08 Tr. 214).

¶{34} A dental assistant who attended the surgery by Dr. Kilgore testified for the defense that the dentist filled the screw hole in the crowns with a material used for making impressions. She had never witnessed this technique before as composite filling is the typical filler whereas impression material would not adhere for long. (12/16/09 Tr. 249).

¶{35} Dr. Gentile testified that once the patient complained to the Better Business Bureau, he developed an intent to replace her crowns so they became temporary or provisional crowns as opposed to permanent crowns. (5/5/09 Tr. 34, 36). A defense expert concurred in this distinction. (12/16/08 Tr. 285-290). Dr. Gentile stated that he told appellant his plan before appellant went in the room. He also stated that appellant was primarily dealing with the patient from a business standpoint. He opined that appellant did not engage in the practice of dentistry at the patient's appointment. (05/05/09 Tr. 41). Two defense experts also opined that neither appellant nor Mr. Melia practiced dentistry. (12/16/08 Tr. 290; 05/05/09 Tr. 14).

¶{36} The court found all three defendants guilty as charged. As to the case at bar, the court found that appellant practiced dentistry by examining the patient, prescribing treatment, and directing a dental assistant to engage in unauthorized practice of dentistry. In an April 20, 2010 judgment entry, appellant was sentenced to a suspended sentence of one hundred eighty days in jail, twelve months of community control, forty hours of community service, and a $500 fine. The within timely appeal resulted.

<u>SUFFICIENCY OF THE EVIDENCE</u>

¶{37} Appellant sets forth two assignments of error, the first of which deals with weight of the evidence. As the evidence must be sufficient before its weight is gauged, we shall relocate the first assignment of error and begin by discussing the second assignment of error, which provides:

¶{38} "THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF PRACTICING DENTISTRY WITHOUT A LICENSE IN THAT THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE VERDICT."

¶{39} Sufficiency of the evidence deals with legal adequacy rather than the weight or persuasiveness of the evidence. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386. In viewing a sufficiency of the evidence argument, we evaluate the evidence in the light most favorable to the prosecution. *State v. Goff* (1998), 82 Ohio St.3d 123, 138. A conviction cannot be reversed on grounds of sufficiency unless the reviewing court determines that no rational juror could have found that the elements of the offense were proven beyond a reasonable doubt. Id.

¶{40} The elements of the offense here are practicing dentistry without a current license from the state dental board or while the license is under suspension. R.C. 4715.01(A). This is a first degree misdemeanor under R.C. 4715.99(C). The definition portion of the chapter provides:

¶{41} "Any person shall be regarded as practicing dentistry, who is a manager, proprietor, operator, or conductor of a place for performing dental operations, or who teaches clinical dentistry, or who performs, or advertises to perform, dental operations of any kind, or who diagnoses or treats diseases or lesions of human teeth or jaws, or associated structures, or attempts to correct malpositions thereof, or who takes impressions of the human teeth or jaws, or who constructs, supplies, reproduces, or repairs any prosthetic denture, bridge, artificial restoration, appliance, or other structure to be used or worn as a substitute for natural teeth, except upon the order or prescription of a licensed dentist and constructed upon or by the use of casts or models made from an impression taken by a licensed dentist, or who advertises, offers, sells, or delivers any such substitute or the services rendered in the construction, reproduction, supply, or repair thereof to any person other than a licensed dentist, or who places or adjusts such substitute in the oral cavity of another, or uses the words 'dentist,' 'dental surgeon,' the letters 'D.D.S.,' or other letters or title in connection with his name, which in any way represents him as being engaged in the practice of dentistry." R.C. 4715.01.

¶{42} Another statute provides that the Dental Board is authorized to issue rules related to the duties of dental assistants; noting that it cannot be construed to allow a dentist to assign functions such as diagnosis, treatment planning, surgical procedures, or any procedure which results in the irremediable alteration of the oral

anatomy. R.C. 4715.39(E)(3)(a)(1)-(3). See, also, R.C. 4715.39(F) and R.C. 4715.99(C). The Ohio Administrative Code provides that certain dental tasks and/or procedures shall not be delegated by any licensed dentists, including: definitive diagnosis and treatment planning; the final placement of any fixed or removable appliances or prefabricated or cast restorations or crowns; the final removal of any fixed appliance; the therapeutic intra-oral adjustment of any fixed or removable appliance; and any other dental tasks which are prohibited by law or agency-level 4715 rules of the Administrative Code. O.A.C. 4715.11-06(A)-(D), (J), (M). A dentist can assign to a basic qualified personnel certain listed functions, including: "Impression, fabrication, cementation and removal of provisional restorations, not to include palliative or sedative restorations" and patient education services such as progress reports and consultation. O.A.C. 4715-11-01(A)(18), (34)(a).

¶{43} Here, there is sufficient evidence to allow a reasonable person to believe that appellant engaged in the practice of dentistry without a license. He introduced himself as "Dr." after being introduced as if he were the final decision-maker. He immediately looked into the patient's mouth, ordered her to move her mouth in certain ways, disclosed the various problems he perceived, and explained the course of treatment. He advertised himself to the patient as having a "forte" in making crowns not just functional but also aesthetically pleasing.

¶{44} He diagnosed a problem with the permanent crowns and he diagnosed a problem with an upper tooth that was taking up too much space due to the absence of a lower tooth. He formulated a treatment plan that included not only new permanent crowns but also the shaving of the upper tooth. He ordered a dental assistant to screw what a rational person could find to be a permanent crown back in, the same assistant who told the patient that he could not proceed until "Dr. Mangie" examined her.

¶{45} Dr. Gentile was in the room for only a brief moment. His intent here is irrelevant as this case is about appellant's actions. In any event, the sequence of events allow a rational person to conclude that it was appellant formulating the dental treatment necessary. Although Dr. Gentile stated that appellant was the business manager, appellant then entered the room and acted as if he were the dentist in charge. He talked about his experience in such matters. He essentially stated that

Mr. Melia was his long-time employee and then instructed him how to proceed, telling him to perform tasks that could themselves be seen as the unlawful practice of dentistry.

¶{46} That is, a plethora of testimony established that the crowns were permanent, that the assistant should not have removed them, and that appellant should not have ordered an assistant to screw a permanent crown in to an indisputably permanent implant. Even if the permanent crowns could transform to temporary crowns based upon a newly formed intent to replace them (which itself is not a mandatory conclusion) appellant still essentially held himself out as the patient's treating dentist. Moreover, he was the one who formed the intent to replace the permanent crowns, even drawing diagrams as to location and ordered the shaving of an actual tooth. This is not some assistant voicing assurance to a patient; it is a former dentist acting as if he is still a licensed dentist. Viewing the evidence in the light most favorable to the state, it does not appear that we can say that no rational fact-finder could conclude that appellant engaged in the unauthorized practice of dentistry. As such, this assignment of error is overruled.

MANIFEST WEIGHT OF THE EVIDENCE

¶{47} Appellant's first assignment of error, which was relocated, alleges:

¶{48} "THE TRIAL COURT ERRED IN CONVICTING APPELLANT OF PRACTICING DENTISTRY WITHOUT A LICENSE WHERE THAT DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

¶{49} Weight of the evidence deals with the inclination of the greater amount of credible evidence to support one side of the issue over the other. *Thompkins*, 78 Ohio St.3d at 387. In reviewing a manifest weight of the evidence argument, the reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the trial court clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Id. A reversal on weight of the evidence is ordered only in exceptional circumstances. Id.

¶{50} In conducting our review, we proceed under the theory that when there are two fairly reasonable views of the evidence or two conflicting versions of events,

neither of which is unbelievable, it is not our province to choose which one should be believed. *State v. Gore* (1999), 131 Ohio App.3d 197, 201. Rather, we tend to defer to the trier of fact who was best able to weigh the evidence and judge the credibility of witnesses by viewing the demeanor, voice inflections, and gestures of the witnesses testifying before it. See *Seasons Coal Co. v. Cleveland* (1994), 10 Ohio St.3d 77, 80; *State v. DeHass* (1967), 10 Ohio St.2d 230, 231.

¶{51} As to the permanency of the crown, testimony showed that the use of a screw is associated with a permanent crown rather than a temporary crown and that the mere absence of composite or amalgam over the screwhead does not turn the crown into a temporary piece. Moreover, it was stated that a temporary crown is never made of porcelain fused with metal. Contrary to appellant's suggestion, one need not conclude that a permanent crown becomes temporary merely because an office decides to order new permanent crowns for a patient who complains about the fit of her permanent crowns. Competent and credible testimony showed that this is not so. In addition, the implants were indisputably permanent structures, and the screw of the crown fits into the implant.

¶{52} In any event, most of the occurrences in the dental office were captured on video and audio tape. Appellant's statements to the patient weigh heavily in favor of the state's position. As we outlined above, appellant held himself out as a dentist at the very least by inference. Under the totality of the circumstances, it is not contrary to the manifest weight of the evidence to find that appellant engaged in the unauthorized practice of dentistry by a combination of actions including conducting a dental examination after introducing himself as Dr. Mangie, diagnosing various issues, assuring that he knew what steps to take, formulating of a treatment plan, essentially stating that he would be the one who ensured the crowns were functional and that they looked good, stating that this was his "forte," ordering another to affix a crown to an implant by use of a screw, and instructing another how to go about remedying the issue including the directing of how much of a permanent tooth should be shaved off.

¶{53} The trial judge occupied the best position to judge the credibility of the witnesses and the weight of the evidence. There is no indication that the court lost its

way and created a manifest miscarriage of justice. Consequently, this assignment of error is overruled.

¶{54} For the foregoing reasons, the judgment of the trial court is hereby affirmed.

Donofrio, J., concurs.
Waite, P.J., concurs.